IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

DEWAYNE OARY,⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀Case No.
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀11-5112-CV-SW-REL-SSA
MICHAEL J. ASTRUE, Commissioner⠀)
of Social Security,⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Defendant.⠀⠀⠀⠀)

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff DeWayne Oary seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) failing to assess limitations due to plaintiff's headaches and need to lie down each day, (2) finding plaintiff's depression is a nonsevere impairment, and (3) failing to conduct a proper credibility analysis. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.⠀⠀⠀BACKGROUND

On February 12, 2010, plaintiff applied for disability benefits alleging that he had been disabled since July 13, 2009. Plaintiff's disability stems from chronic obstructive pulmonary disease[1] with history of partial right lung removal, hypertension, right upper quadrant abdominal hernia, headaches, and depression. Plaintiff's application was denied on April 26, 2010. On December 15, 2010, a hearing was held before an Administrative Law Judge. On

---

[1]Chronic obstructive pulmonary disease ("COPD") refers to a group of lung diseases that block airflow as you exhale and make it increasingly difficult to breathe. Emphysema and chronic asthmatic bronchitis are the two main conditions that make up COPD. In all cases, damage to the airways eventually interferes with the exchange of oxygen and carbon dioxide in the lungs.

May 27, 2011, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On September 29, 2011, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

2

### III.    *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

3

5.       Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff and vocational expert Douglas Lindahl, in addition to documentary evidence admitted at the hearing.

## A.     ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record shows that plaintiff earned the following income from 1986 through 2010:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1986 | $ 520.93 | 1999 | $ 24,293.43 |
| 1987 | 948.05 | 2000 | 23,071.51 |
| 1988 | 3,176.72 | 2001 | 28,715.98 |
| 1989 | 8,232.27 | 2002 | 24,723.91 |
| 1990 | 7,080.96 | 2003 | 28,405.39 |
| 1991 | 6,917.61 | 2004 | 32,538.60 |
| 1992 | 3,192.26 | 2005 | 23,627.12 |
| 1993 | 7,817.27 | 2006 | 26,944.42 |
| 1994 | 3,330.13 | 2007 | 30,161.26 |
| 1995 | 14,902.92 | 2008 | 17,753.87 |
| 1996 | 16,857.30 | 2009 | 4,138.63 |
| 1997 | 21,770.20 | 2010 | 0.00 |
| 1998 | 20,036.82 | | |

4

(Tr. at 123).

## Function Report

In a Function Report dated March 8, 2010, plaintiff reported that he gets up and drinks coffee, gets dressed, reads the Bible, does housework, talks with his wife, watches television, takes a shower, then goes to bed around 10:00 or 11:00 p.m. (Tr. at 153-160). He feeds his animals and lets them out. He often gets winded when taking a shower. Plaintiff can prepare his own meals for 20 to 30 minutes. He cleans and does laundry, he burns trash and does some mowing. Plaintiff is unable to use some cleaning supplies. He is able to go out alone; he is able to drive a car. Plaintiff shops in stores for food and household goods. He can shop twice a week for 10 to 30 minutes. He is able to handle the household finances. Plaintiff reads often, and he goes outside about twice a week. He visits with his father-in-law and talks to other family members on the phone. Plaintiff goes to church once or twice a week. He has no problems getting along with others.

Plaintiff has trouble sleeping due to difficulty breathing. His condition affects his ability to lift, squat, bend, reach, walk, talk, climb stairs and concentrate. He can lift, squat, bend and reach, but cannot do it repetitively (Tr. at 160). His condition does not affect his ability to stand, sit, kneel, hear, see, remember, complete tasks, understand, follow instructions, use his hands, or get along with others (Tr. at 158). He has no trouble following directions. Plaintiff can walk about 50 feet before needing to rest.

## Work History Report

In a Work History Report dated March 8, 2010, plaintiff reported that he worked as a general laborer for a temporary agency from June 2008 through July 2009 (Tr. at 164-175). During his assignments, he would stand for eight hours (Tr. at 165). He reached for eight hours; handled, grabbed, or grasped large objects eight hours each day; and he could write,

5

type or handle small objects for eight hours each day.  He lifted up to 50 pounds, 25 pounds frequently.

**B.    SUMMARY OF MEDICAL RECORDS**

Nearly all of plaintiff's medical records are dated prior to his alleged onset date.

On February 3, 2007, plaintiff went to the emergency room at Freeman Hospital due to difficulty breathing and back pain after a fall (Tr. at 361-365).  He reported smoking a pack and a half of cigarettes per day.  X-rays showed no broken ribs or pneumothorax (collapsed lung), but he did have emphysema.[2]  Plaintiff was advised to stop smoking.

On February 5, 2007, plaintiff went to the emergency room at Freeman Hospital after coughing up yellow phlegm with a small amount blood and suffering back pain (Tr. at 356-360).  He had mild difficulty breathing with wheezes[3] and rhonchi[4] and pain on deep breathing.  He was diagnosed with acute pneumonia[5] but declined hospitalization.  Although he was diagnosed with acute pneumonia, chest x-rays showed no definite pneumonia, pleural

---

[2]Emphysema occurs when the air sacs in the lungs are gradually destroyed, making the patient progressively more short of breath.  As it worsens, emphysema turns the spherical air sacs -- clustered like bunches of grapes -- into large, irregular pockets with gaping holes in their inner walls. This reduces the surface area of the lungs and, in turn, the amount of oxygen that reaches the bloodstream.

Emphysema also slowly destroys the elastic fibers that hold open the small airways leading to the air sacs. This allows these airways to collapse when you breathe out, so the air in your lungs can't escape.

[3]Wheezes are described as relatively "continuous" sounds as compared to crackles. They usually last for more than 200 milliseconds and have a musical quality.   Wheezes are believed to be caused by airway narrowing.

[4]Rhonchi are described as "continuous" sounds. They are lower in pitch than wheezes and have a snoring quality. Although rhonchi are almost always due to airway secretions and usually clear with cough, they may be present in other conditions that cause airway narrowing.

[5]Pneumonia is an inflammation of the lungs caused by infection.

Case 3:11-cv-05112-REL   Document 15   Filed 12/03/12   Page 6 of 47

effusion (fluid in the lung) or pneumothorax. However, bullous disease[6] was noted.

On February 7, 2007, plaintiff went to the emergency room at Freeman Hospital complaining of back pain after having fallen on the ice (Tr. at 351-355). He had decreased breath sounds. X-rays showed no rib fracture but bullous changes of the right lung. He was diagnosed with contusion (bruise) and sprain and discharged home.

On June 9, 2007, plaintiff went to the emergency room at Freeman Hospital complaining of shortness of breath (Tr. at 316-350). Plaintiff admitted to "a longstanding smoking history" of two packs a day for 20 years (Tr. at 322). He had decreased breath sounds on the right. The rest of his physical exam was normal, including his psychological exam. He was diagnosed with a spontaneous pneumothorax (collapsed lung). He was transferred to the hospital where a chest tube was inserted and a chest CT was performed. After no improvement in air leak, plaintiff was taken into surgery on June 12, 2007, and a resection[7] was performed on his right lung. By June 18, 2007, plaintiff had no pain and no difficulty breathing. He was discharged home with no physical restrictions except "no heavy lifting x 8 to 10 days."

On June 27, 2007, Michael Phillips, M.D., examined plaintiff and indicated that his chest x-ray showed no residual pneumothorax (Tr. at 277-280, 314-315). "Since the prior

---

[6]Emphysema can be defined as being characterized by an increase in the sizes of the airspaces at the end of the breathing passages. This increase in size beyond normal arises from the destruction of the airspace walls and a loss of the normal elastic properties. The term "bullous disease of the lungs" indicates the presence of bullae, which are abnormal airspaces resulting from the destruction of normal airspace wall tissue and are best described as thin walled air sacs under tension. These changes, along with the fibrosis, lead to a reduction in the lung's ability to expand and contract and therefore adversely effect the ability to pass oxygen to the blood stream from the lungs.

[7]Surgical removal of all or part of an organ. In this case a portion of plaintiff's lung was removed.

7

examination, the lungs are better expanded and clearer." Under recommendations, Dr. Phillips wrote, "Clinical dismissal. Excellent result."

On July 2, 2007, plaintiff went to the emergency room at Freeman Hospital reporting post-surgery pain in his lungs (Tr. at 310-313). He was having shortness of breath which was worsened by taking a deep breath. The records indicate that plaintiff had quit smoking. On exam, rales[8] and rhonchi were noted. Chest x-rays were unchanged. The remainder of his exam was normal, including mood and affect. He was diagnosed with chest pain and discharged home.

On July 9, 2007, plaintiff had a pulmonary function test done at Freeman Health System (Tr. at 308-309). Dr. Khan assessed mild obstructive airway disease, hyperinflation with air trapping, and decreased DLCO.[9]

On July 16, 2007, plaintiff saw Sohail Khan, M.D., for a follow-up on spontaneous pneumothorax (Tr. at 282-283). Plaintiff had no cough, sputum (mucus or phlegm coughed up), hemoptysis (coughing up blood) or wheezing. His shortness of breath "is at baseline." Plaintiff's pulse oximetry (measurement of oxygen saturation in the blood) was 98% on room air. Plaintiff's physical exam showed no cyanosis[10] or labored breathing. He had good air

---

[8]Rales are small clicking, bubbling, or rattling sounds in the lung. They are believed to occur when air opens closed air spaces.

[9]A lung function test. Lung diffusion testing measures how well the lungs exchange gases. This is an important part of lung testing, because the major function of the lungs is to allow oxygen to "diffuse" or pass into the blood from the lungs, and to allow carbon dioxide to "diffuse" from the blood into the lungs. You breathe in (inhale) air containing a very small amount of a tracer gas, such as carbon monoxide. You hold your breath for 10 seconds, then rapidly blow it out (exhale). The exhaled gas is tested to determine how much of the tracer gas was absorbed during the breath.

[10]Cyanosis is a physical sign causing bluish discoloration of the skin and mucous membranes. Cyanosis is caused by a lack of oxygen in the blood.

8

entry bilaterally. Plaintiff's recent chest x-ray was reviewed, and Dr. Khan noted a small pneumothorax at the right apex, which was stable. Dr. Khan assessed severe emphysema and mild COPD per pulmonary function tests. He noted that plaintiff had a history of smoking. He told plaintiff to use Albuterol[11] as needed, and stated that there was no need to use Spiriva[12] or Advair[13] at this time. Dr. Khan also assessed nicotine addiction. "The patient has quit smoking since hospital discharge. The patient was encouraged - he was again informed regarding the benefits of smoking cessation." He advised plaintiff to increase his activity level as tolerated and released him to return to work. Plaintiff was advised to have yearly pulmonary function tests.

On August 10, 2007, plaintiff went to the emergency room at Freeman Hospital complaining of a skin rash for the past two days (Tr. at 305-307). The records state that plaintiff had quit smoking. Plaintiff had normal breath sounds, his mood and affect were normal, and the remainder of his exam was essentially normal except for a skin rash. He was given Prednisone[14] and Vistaril.[15]

On October 21, 2007, plaintiff went to the emergency room at Freeman Hospital complaining of cough, stuffy nose, chills, and body aches (Tr. at 300-304). Plaintiff was smoking one pack of cigarettes per day. Two and a half months had passed since his last emergency room visit when he was not smoking. His only medication was Albuterol. On

---

[11]Albuterol is in a class of medications called bronchodilators. It works by relaxing and opening air passages to the lungs to make breathing easier.

[12] Used to prevent bronchospasm in people with bronchitis, emphysema, or COPD.

[13] Used to prevent asthma attacks and to treat COPD.

[14]A steroid used to treat allergic reactions.

[15]Treats allergic skin reactions.

9

exam he had some wheezing, but everything else was normal. He was diagnosed with acute bronchitis.[16] He was prescribed an antibiotic and a steroid.

On October 27, 2007, plaintiff was seen in the emergency room at Freeman Hospital complaining of shortness of breath (Tr. at 295-299). Plaintiff was wheezing and coughing. He was listed as a smoker. He indicated he had an inhaler "but only used it twice today. Nothing really seems to make his symptoms better or worse at this time." On exam plaintiff had some wheezing and decreased breath sounds bilaterally. His mood and affect were normal. Plaintiff's blood work was normal, his chest x-ray was unchanged, his EKG was normal. Matthew Boyer, D.O., wrote, "Patient is on medicines for this. I do not think he is using his inhaler as much as he should." Dr. Boyer told plaintiff to use his inhaler every two to four hours. "The patient was reexamined numerous times during his stay in the Emergency Department and remained stable, was walking around on portable pulse ox and this stayed above 92%. Patient, otherwise, is stable." Plaintiff was discharged home.

On November 28, 2007, plaintiff went to the emergency room at Freeman Urgent Care complaining of shortness of breath and right chest pain wrapping around from the back for the past week (Tr. at 290-293). Plaintiff was listed as a smoker. His chest x-rays were unchanged from previous scans. He was assessed with COPD and tobacco abuse.

Approximately ten months later, on October 1, 2008, plaintiff went to the emergency room at Freeman Hospital complaining of shortness of breath (Tr. at 286-289). The doctor noted that plaintiff's airway was normal but "irritated-appearing from cig[arette] smoking". Plaintiff was diagnosed with pneumonia.

_____

[16]Bronchitis is an inflammation of the lining of the bronchial tubes, which carry air to and from the lungs.

10

July 13, 2009, is plaintiff's alleged onset date. However, there are no treatment records for the 9 1/2 months prior to this date, nor are there any treatment records for the eight months following his alleged onset date until plaintiff saw Dr. Gallemore on March 2, 2010, to establish care -- approximately two weeks after he filed his first application for disability benefits.

On March 2, 1010, plaintiff saw Rex Gallemore, M.D., to establish care (Tr. at 250-252). According to the record before me, this is the only time plaintiff ever saw Dr. Gallemore. Plaintiff reported a history of chronic obstructive pulmonary disease, chronic bronchitis, and emphysema. "The patient currently takes no routine medications. . . . The patient states he smokes approximately one pack of cigarettes on a daily basis." Plaintiff said he is disabled due to shortness of breath at rest and even with minimal exertion. He said he had not been able to work since December 2007 due to his condition. Plaintiff reported some intermittent chest pain. His physical exam was normal. He was ambulatory with a normal gait, his heart was normal, his lungs were without crackles or wheezes but had diminished breath sounds bilaterally consistent with his history of chronic obstructive pulmonary disease. Dr. Gallemore assessed shortness of breath by history, dyspnea upon exertion by history, chest pain of uncertain etiology, chronic obstructive pulmonary disease by history, chronic bronchitis by history, and tobacco abuse by history. He recommended plaintiff undergo pulmonary function testing and chest radiography to evaluate his complaints of shortness of breath and dyspnea upon exertion, and that he undergo cardiac stress testing and echocardiography in order to evaluate his complaints of chest pain and shortness of breath on exertion.

On March 19, 2010, plaintiff saw Yung H. Hwang, M.D., who measured plaintiff's range of motion in connection with his disability application (Tr. at 259-261). Everything was normal.

On March 23, 2010, Dr. Hwang wrote a letter to Disability Determinations indicating that he had seen plaintiff for a "disability evaluation with the following complaints.

1)      Emphysema.

2)      Partial right lung removal.

3)      Shortness of breath.

4)      Immunities low, bronchitis.

5)      Dizziness.

6)      Coughing, tightness in chest.

7)      Low self esteem.

(Tr. at 255-257). Dr. Hwang described plaintiff as a man who had worked in a fiberglass manufacturing company inhaling dust fumes along with smoking two packs of cigarettes daily "but recently cut back to 1 pack daily for many years."

> His lung still causes lots of problems with shortness of breath, wheezing and constantly coughing. Due to these problems he is unable to walk much more than 50 feet and 10 minutes at most but he is able to lift 50 pounds but unable to carry any distance so he was forced to quit working. Patient was also told he had emphysema prior to lung resection due to smoking in 2005. His immune system is so low any change of weather or extreme tiredness causes him to catch cold and he has lots of respiratory distress at all times. He has no back pain and walks straight with no limp. . . .

* * * * *

> PERSONAL HISTORY: Patient had smoked two packs daily for 22 years and recently cut down to one pack daily. . . .

> CURRENT MEDICATIONS: Combivent inhaler.[17]

> REVIEW OF SYSTEMS

> HENT: No headaches but dizziness with no stiffness.

---

[17]Used to prevent bronchospasm in people with COPD.

CARDIOPULMONARY SYSTEM: Constant increased shortness of breath, wheezing and coughing with congestion and catch cold eaisly [sic]. He has no chest pain or discomfort.

\* \* \* \* \*

MUSCULOSKELETAL SYSTEM: No back pain or limping.

NEUROPSYCHIATRIC SYSTEM: Patient is mentally clear with no hallucinations, illusions or confusion. He is very understanding and comprehends well and is able to tend to his own daily needs and affairs. He graduated 12th grade with no difficulty and is very intelligent.

On exam, plaintiff had full range of motion in his neck and upper extremities, he had full grip strength bilaterally, his heart was normal, he had full range of motion in his back with no tenderness, he had full range of motion in his ankles, knees and hips bilaterally. Plaintiff had diminished lung sounds bilaterally with frequent wheezing and rhonchi. "He uses accessory muscles to breath [sic] deeply."

Dr. Hwang assessed severe advanced COPD and status right pulmonary lobe resection for emphysematory bleps.

DISCUSSION: This patient is very intelligent. . . . Physically, patient is quite limited due to respiratory distress with shortness of breath, wheezing and coughing attacks. Patient stated he is able to walk 10 minutes at most before he is out of breath and has to rest but is able to lift 50 pounds although he is unable to carry. He attempted to continue working but was sick so often he had to quit. Patient needs to see his regular physician for proper medication and treatment as Combivent alone is not controlling his wheezing and discomfort from shortness of breath and coughing. He likely needs to have further pulmonary function testing and have Nebulizer for home treatment as well as possibly getting Oxygen pm and at night to relieve symptoms. In the meantime he is unable to work in any type employment.

That same day Dr. Hwang responded to questions sent by DDS (Tr. at 259-261). He noted that plaintiff had no mental problem, that pulse oximetry results were not available, and he referred DDS to the above-described note. There are no further medical records from Dr. Hwang.

13

On April 9, 2010, plaintiff was seen at Freeman Health System for a pulmonary function test at the request of Disability Determinations (Tr. at 264-275). Plaintiff had not had an acute respiratory illness in the last six weeks. Plaintiff was still smoking one pack of cigarettes per day. Testing revealed a forced expiratory volume (FEV1)[18] of 2.75 post bronchodilator, substantially above the listing level of 1.65 but below the level of a healthy individual (3.94).

On April 29, 2010, plaintiff saw Bruce Akuna, M.D., reporting difficulty breathing, shortness of breath, and pain on breathing (Tr. at 370). "Gets lighthead[ed], happens every day - several times/per day - starts - 2 hrs after awakening & stays the remainder of the day. Has used Combivent, which helps the most - not on now - 0 insurance". Strangely, "respiratory symptoms" was listed as negative. "Psychological symptoms" was also marked as negative. On exam, plaintiff's heart, psychological condition, and skin were listed as normal. There was apparently no exam done of his respiratory system as that part was left blank. Plaintiff was assessed with COPD and tobacco addiction. Dr. Akuna recommended blood work, but plaintiff deferred, stating that he would rather wait until he has insurance.

On May 7, 2010, plaintiff saw Dr. Akuna for "paper work" (Tr. at 369). His physical exam was all normal except he had decreased "but clear" breath sounds. He was assessed with COPD, hypertension, and depression (even though his psychological exam was marked as

---

[18]The amount of air which can be forcibly exhaled from the lungs in the first second of a forced exhalation. Measuring FEV1 is done through spirometry testing which helps the doctor determine the patient's lung function. Because COPD causes the air in lungs to be exhaled at a slower rate and in a smaller amounts compared to a healthy person, measuring how well the patient can forcibly exhale air can help determine the presence of COPD. The three key spirometry measurements (the FVC (forced expiratory volume), FEV1 (forced expiratory volume in one second) and FEV1/FVC ratio) for a given individual are compared to reference values. The reference value is based on healthy individuals with normal lung function and it tells the doctor the values that would be expected for someone of the same sex, age and height. Plaintiff's expected FEV1 was 3.94.

14

normal).  He was told to continue his breathing medications, his lisinopril for hypertension and was started on Celexa, an antidepressant.

That same day, Dr. Akuna completed a Medical Source Statement - Physical (Tr. at 372-373, 394-395).  He found that plaintiff can lift and carry 15 pounds frequently and 20 pounds occasionally.  He found he could stand or walk continuously for less than 15 minutes and for a total of four hours per day.  He found that plaintiff could sit for one hour at a time and for a total of six hours per day.  He had an unlimited ability to push or pull with hand or foot controls.  He found that plaintiff could frequently stoop, kneel, crouch, crawl, reach, handle, finger, feel, see, speak and hear.  He found that plaintiff could occasionally climb and balance. He found that plaintiff should avoid concentrated exposure to extreme cold and heat; moderate exposure to weather, vibration and heights; and any exposure to wetness, humidity, dust and fumes.  The form asks whether, if the plaintiff suffers from pain, there is a need to lie down or recline to alleviate symptoms during an eight-hour work day.  Dr. Akuna checked "yes" and wrote that plaintiff would need to lie down or recline two times in a six-hour period.  He noted that plaintiff's COPD and resulting decreased stamina causes a decrease in his concentration, persistence or pace.  Plaintiff's medical history was listed as COPD, hypertension and depression.

On July 15, 2010, plaintiff saw Bruce Akuna, M.D., at the Freeman Family Clinic for a follow up (Tr. at 367).  Dr. Akuna noted that plaintiff's hypertension was well-controlled with medication and plaintiff was breathing well while using his medications.  Overall plaintiff was described as "doing well."  Dr Akuna noted that plaintiff had a reducible right upper quadrant hernia.[19]  He recommended plaintiff continue on his same medications.

_____

[19]A hernia is a sac formed by the lining of the abdominal cavity (peritoneum). The sac comes through a hole or weak area in the fascia, the strong layer of the abdominal wall that

On October 14, 2010, plaintiff went to the emergency room at Freeman Hospital due to abdominal pain (Tr. at 375-377). Plaintiff was listed as a smoker. Plaintiff had no observable respiratory distress; his psychological evaluation was normal. He had abdominal tenderness and was assessed with a hernia. He was discharged in stable condition and told to follow up with Dr. Coy.

On January 12, 2011,[20] plaintiff was evaluated by AmyKay Cole, Ph.D., a psychologist, at the request of Disability Determinations (Tr. at 385-393). She administered the Wechsler Adult Intelligence Scale-IV ("WAIS-IV"), Wide Range Achievement Test-4[21] ("WRAT-4"), Minnesota Multiphasic Personality Inventory-2[22] ("MMPI-2"), Wechsler Memory Scale-4th Edition ("WMS-4"), Mental Status Exam, Modified Mini Mental Status Exam, and Six Item Cognitive Impairment Test-Kingshill Version 2000.

_____

surrounds the muscle.

[20]Dr. Cole's report is actually dated January 12, 2010, rather than 2011. However, the parties state that plaintiff filed a Title XVI application on February 12, 2010, and a Title II application on February 21, 2010. Dr. Cole's evaluation was done on January 10, "2010," which, she states, was "following application for Social Security benefits." Clearly January 10, 2010, comes before plaintiff's applications for disability benefits. Plaintiff testified in December 2010 that he was diagnosed with a hernia eight months earlier, which would have been in approximately April 2010; however, Dr. Cole's report refers to the hernia. Dr. Cole completed a Medical Source Statement in January 2011. All of this seems to indicate that the year was mistyped on Dr. Cole's January 12, 2010, report and that she evaluated plaintiff in January 2011 rather than January 2010.

[21]Helps to identify disabilities in reading, spelling, and arithmetic skills. The test involves the following: reading -- recognizing and naming letters, pronouncing printed words; spelling -- writing names, writing letters and words from dictation; arithmetic -- counting, reading number symbols, oral problem computations.

[22]Used by clinicians to assist with the diagnosis of mental disorders and the selection of appropriate treatment methods. The MMPI consists of 550 descriptive statements which are to be answered with "true", "false" or "cannot say," depending on whether the patient believes it applies to him or not. The patient's responses are scored across 14 basic scales. These statistical scales measure personality dimensions such as one's proneness to hypochondria or pessimism, level of sociability, interpersonal assertiveness, degree of femininity and masculinity, etc.

Plaintiff reported being close to his family. His father passed away five years earlier, and his older brother committed suicide two months ago. Plaintiff reported approximately six previous jobs. He worked at a door factory for three years and was "not sure" why he left that job, but he then became a waiter for six months. That job ended when the restaurant closed. He worked for one year as a load operator but was let go when he was sent to jail. He next worked at a potting soil factory for a year and a half. He was not sure why he left that job. He then worked at another door factory for two and a half years. He quit that job when he moved. He began working as a team leader at Able Body, a position he held for nine and a half years. He left that job because the fiberglass used was affecting his lungs.[23] His last job was at a temporary company where he worked for eight months. He said he left that job "due to health concerns in 2009." Plaintiff said that his "health concerns" are his primary obstacle to working.

Medical History:
He was diagnosed with COPD in 2007 after he was hospitalized. He coughed hard one morning and believed that he had injured his back when, in fact he had collapsed his lung. . . . They removed a third of his lung at that time but he has not received further treatment other than prescription medication. He further reported an ulcer and a hernia which currently needs to be treated. He consumes a cup and a half of coffee per day and five Mountain Dews. He denied any history of drug or alcohol usage. He currently smokes a half a pack of cigarettes a day. His current medications include

---

[23]In June 2007 when plaintiff was hospitalized for surgical resection of a lung, he described his employment to his treating doctor as follows: "[He] works at a factory that makes military hoods for vehicles. In his job he is not directly exposed to toxins or dust but he does run machines that use fiberglass and resins but all of those are enclosed in hooded equipment and he has very little exposure to the fumes. He has no other significant exposures to organic dusts, welding, etcetera." (Tr. at 328).

Case 3:11-cv-05112-REL   Document 15   Filed 12/03/12   Page 17 of 47

Spiriva,[24] Symbicort,[25] Proair,[26] Lisinopril,[27] Atenolol,[28] and Celexa.[29]

Psychiatric History:
. . . He began feeling depressed approximately two years ago when his medical problems intensified and he was unable to work. He initially felt sadness, frustration, and inadequacy. As time progressed he began having more significant symptoms of depression including difficulty with concentration and memory, as well as strong feelings of dysphoria[30] and anhedonia.[31] Those feelings further intensified when his brother shot himself two months ago. He has experienced some passive suicidal ideation in recent months but denied any plan or intent.

DAILY ACTIVITIES AND SOCIAL FUNCTIONING:
Mr. Oary typically wakes at 8:00 AM. He has coffee in the morning and spends much of the day and evening driving his son, daughter, and daughter-in-law to and from their individual employment positions. They do not have cars and Mr. Oary serves as their primary transportation. During the day he also does housework and keeps up with his bills. The housework is difficult for him at times due to his hernia and he has to lay [sic] down a couple of times a day in order to stop the pain in his stomach. He watches little T.V. and goes to bed around 2:30 a.m. after he picks up the last person from employment. He denied any social visits in or out of the home.

MENTAL STATUS EXAM:
Behavioral Observations and Symptom Presentation:
Mr. Oary drove himself to the interview and was prompt. He was casually dressed in jeans, a sweatshirt, and boots. He also wore a cap throughout the appointment. He was slender in build and wore glasses and a wedding ring. His hair was somewhat long but his beard was groomed and he displayed adequate grooming and hygiene. He smelled like cigarette smoke and was missing a front tooth. During the interview his hands shook during the beginning portion of testing but, as he became more relaxed, the shaking became less noticeable. He held his side on several points during the interview which he attributed to his hernia pain. His speech was clear and easy to understand.

---

[24]A once-a-day inhaler for COPD.

[25]Used to prevent bronchospasm in people with asthma or COPD.

[26]A quick-relief rescue inhaler that can help manage COPD.

[27]Treats hypertension.

[28]Treats hypertension.

[29]Anti-depressant.

[30]Feelings of anxiety, restlessness, and dissatisfaction.

[31]Absence of pleasure from the performance of acts that would normally be pleasurable.

18

He was friendly and good natured throughout the appointment. He provided clear, direct responses to all questions and no abnormality in speech or thought processes were [sic] noted. He also denied any symptoms of psychosis. His mood was mildly depressed with congruent affect. He did not cry at any point during the interview but acknowledged feelings of sadness.

Plaintiff achieved a full scale IQ score of 82 which places his overall intellectual functioning in the low-average range on the WAIS-IV and in the borderline range according to the DSM-IV. Dr. Cole found that plaintiff demonstrated strong verbal comprehension, strong range of general factual knowledge, good long-term memory, good verbal ability, and intellectual curiosity. His perceptual abilities fell within the low-normal range. His biggest nonverbal challenges were in visual information processing and nonverbal abstract reasoning skills. "It is possible that his visual reasoning abilities were impacted by his reported poor concentration which may be linked to his depression."

Personality Assessment:
Mr. Oary completed a computer administered version of the MMPI-2. His scores on the MMPI-2 were called into question based on issues of validity. Specifically, his extremely elevated F-scale score of 98 suggests an exaggeration of psychological symptomatology. His low L-scale score of 33 further indicated an exaggeration of pathology. This pattern persisted through the MMPI-2 evaluation and his F6 score of 87 suggested he continued this exaggeration on the latter half of the MMPI-2 administration as well. . . . This strong report of psychological dysfunction was inconsistent with his reports during the interview and so extreme that it invalidated his MMPI-2 profile.

SUMMARY:
. . . . He does not have a history of psychological impairment other than adjusting to his current financial and physical ailments. He likely experienced an adjustment disorder when first addressing his diagnoses and limited finances; however, over the last year his feelings of depression have intensified at least partially due to the suicide of his oldest brother. His current depressive episode is mild. . . . He has not experienced any psychological or psychiatric treatment other than receiving a prescription for Celexa one year ago to treat his depression. That medication was prescribed by a general practitioner and he has not seen a mental health professional. . . .

Mr. Oary spends a good portion of the day driving his three adult children to and from their different employment positions. He was friendly and good natured throughout a long afternoon of testing. . . .

Dr. Cole assessed major depressive disorder, single episode, mild. She assigned a GAF score of 70.[32] She listed the following recommendations:

> Mr. Oary would be able to understand simple tasks. He would be able to concentrate and persist in those tasks and would respond most effectively to verbal as opposed to visual instructions. He has the capacity to work appropriately with the general public but would most likely prefer to work with coworkers and a supervisor. In sum, he would be able to adapt to a simple workplace environment without intrusion from psychological symptomatology. However, his overall performance in the workplace and ability to work with more complex tasks would be improved with successful treatment of his depression. He would be able to manage funds in his own interest.

(Tr. at 385-393).

On January 20, 2011, Dr. Cole completed a "Medical Source Statement of ability to do work-related activities (mental)" (Tr. at 382-384). She noted that plaintiff had no difficulties understanding, remembering, and carrying out simple instructions; no difficulty in making judgments on simple work-related decisions; moderate difficulty understanding, remembering, or carrying out complex instructions; and moderate difficulty making judgments on complex work-related decisions. His full scale IQ as listed as 82 with poor processing speed on visual tasks, and he had an 8th grade math ability. She noted that he had no difficulty interacting appropriately with the public, supervisors, and co-workers, and had no difficulty responding appropriately to usual work situations and to changes in a routine work setting.

*C.*   *SUMMARY OF TESTIMONY*

During the December 15, 2010, hearing, plaintiff testified; and Douglas Lindahl, a vocational expert, provided testimony through interrogatories.

_____

[32]A global assessment of functioning of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

1.    **Plaintiff's testimony.**

Plaintiff was 41 years of age at the time of the hearing and is currently 43 (Tr. at 30).

Plaintiff has a high school diploma and completed training to be a certified nurse assistant (Tr.

at 30).  His CNA license expired shortly before the administrative hearing, however (Tr. at 30).

Plaintiff lives in a mobile home with his wife, daughter and son, both of whom are adults (Tr.

at 31).  Plaintiff's wife does not work -- she has applied for disability benefits (Tr. at 44).

Plaintiff filed for unemployment benefits since he lost his last job and received the maximum

amount (Tr. at 44-45).  Those benefits ended sometime in 2009 (Tr. at 45).

Plaintiff last worked at a temporary agency working at a fireworks stand and prior to

that worked in a food manufacturing company (Tr. at 41).  He left the job at the fireworks

stand because the job ended (Tr. at 42).  At the food manufacturing company he stacked

product on pallets that came off the line (Tr. at 42).  He had to lift up to 40 pounds (Tr. at 42).

He left that job because it was a temporary position and the assignment ended (Tr. at 42).

Plaintiff has never lost a job because of his physical condition (Tr. at 42).

Plaintiff worked as a certified nursing assistant in 2008, which was after his lung

surgery in 2007 (Tr. at 42).  He only worked as a CNA for a couple months because he could

not handle the lifting (Tr. at 43).  Prior to working as a CNA plaintiff spent ten years at Abel

Manufacturing, but he had to give that job up due to his condition (Tr. at 43).

Plaintiff is 5'8" tall and weighs 145 pounds (Tr. at 31).  Plaintiff is unable to work

because he has emphysema (Tr. at 31).  He cannot be around chemicals or perfumes, which

cause tightness in his chest and also cause headaches (Tr. at 31-32).  Humidity and cold

weather make him more susceptible to a cold, and if he gets a cold it turns into pneumonia (Tr.

at 32).  Plaintiff has problems with shortness of breath "probably every day" (Tr. at 32).  "A lot

of activity" causes his shortness of breath (Tr. at 32).  He can walk 50 feet before needing to

stop for ten to 15 minutes (Tr. at 32-33). He can stand for about 30 minutes and then he would be winded from standing up (Tr. at 33). He can sit for 10 to 30[33] minutes at a time (Tr. at 35). After sitting that long, his side bothers him due to his hernia and his back starts hurting from his chest being tight (Tr. at 36, 41). Plaintiff has never had any diagnosis associated with back problems (Tr. at 41). Plaintiff can lift about five pounds -- Dr. Akuna restricted his lifting to five pounds because of a hernia (Tr. at 33). That restriction was given when plaintiff accompanied his wife to the doctor in August of 2010 (Tr. at 39). Plaintiff has had the hernia for about eight months (Tr. at 33). Bending over, squatting, or turning quickly aggravate plaintiff's hernia (Tr. at 34). His doctor said there is not much than can be done about the hernia until "it pops out and won't go back in" and then they will have to do something (Tr. at 34). Dr. Akuna has not suggested a support wrap or a surgical consultation, even though plaintiff has reported constant pain from the hernia (Tr. at 39). Plaintiff went to the emergency room in October 2010 due to abdominal pain, and he was told to see a surgeon, Dr. Coy (Tr. at 40). Plaintiff has not done that because he cannot afford to see a surgeon (Tr. at 40). Plaintiff applied for but was denied a medical card, but he has not talked to anyone about programs that might give him access to medical care (Tr. at 40). The emergency room doctor, however, told plaintiff that there is nothing that can be done about his hernia because they "don't usually really do surgery on a hernia until it's actually to the point where they have to" (Tr. at 40).

     Plaintiff has a constantly high pulse rate and his blood pressure is high, both due to his breathing difficulties (Tr. at 34). When his blood pressure goes up, he gets headaches (Tr. at

---

[33]Plaintiff said he could sit for "[p]robably about 10 minutes. 10, 15 minutes." His attorney asked, "Now, is that actually -- are you talking about getting up from sitting or just kind of squirming around in the chair?" He said, "Probably a half hour of sitting I have to get up, but 10, 15 minutes sitting here, if I'm lucky, I have to move around." (Tr. at 35).

34).  He gets two or three headaches a week which last for two to three hours (Tr. at 34-35).

Plaintiff had been using aspirin and Tylenol for his headaches, but he developed an ulcer and can no longer take those medications, so now he lies down and closes his eyes for about an hour when he gets a headache (Tr. at 35).

Plaintiff has been diagnosed with depression because of his situation (Tr. at 36).  Since April 2010 plaintiff has been taking medication for depression which helps although there are some days of extra stress when he has to take two pills instead of one (Tr. at 37, 41).  His depression causes him to feel like less of a man because he cannot provide for his family (Tr. at 37).  When he is having difficulty breathing, he cannot concentrate as well and cannot focus on things (Tr. at 37).  He has no difficulties with his memory (Tr. at 38).  When he is hurting or not breathing well, he lashes out at people (Tr. at 38).

Plaintiff lies down due to pain or fatigue twice a day, sometimes more often (Tr. at 35).  He lies down from 45 to 90 minutes at a time (Tr. at 35).   During a typical day, plaintiff tries to do some housework, he dusts, he washes a few dishes (Tr. at 38).  He does not vacuum and he is "not allowed" to take the trash out (Tr. at 38).  He does not have any activities outside his home (Tr. at 38).  Plaintiff spends most of his day reclining but also has to lie down flat in bed to ease his hernia pain (Tr. at 43-44).  Prior to having a hernia, plaintiff had to lie down twice a day for about an hour each time due to headaches (Tr. at 44).  Plaintiff has never been treated for headaches (Tr. at 44).

Plaintiff's inhalers have a tendency to raise his blood pressure a little (Tr. at 36).  Plaintiff was still smoking at the time of the hearing, but he said he was down to about a quarter pack a day (Tr. at 43).

Case 3:11-cv-05112-REL   Document 15   Filed 12/03/12   Page 23 of 47

## 2.    Vocational expert testimony.

Vocational expert Douglas Lindahl provided testimony at the request of the Administrative Law Judge by way of interrogatories (Tr. at 231-234).  The first hypothetical involved a person with the limitations described by Dr. Akuna in a medical source statement found at pages 371-373 of the transcript (Tr. at 232).  The vocational expert testified that such a person could do none of plaintiff's past relevant work, but the person could be a border semi-conductor, with 2,000 jobs in Missouri and 115,000 in the country; a touch up screener, with 1,800 in Missouri and 98,000 in the country; or a document preparer, with 595 in Missouri and 25,600 in the country (Tr. at 233).  All of these jobs are sedentary with an SVP[34] level of 2 (Tr. at 233).  This response is not in accordance with the Dictionary of Occupational Titles because the DOT does not address lying down (Tr. at 233).  The vocational expert stated that his responses are based on 36 years of experience working with clients and employers (Tr. at 233).

## V.    *FINDINGS OF THE ALJ*

Administrative Law Judge Michael Dayton entered his opinion on May 27, 2011 (Tr. at 11-21).  He found that plaintiff meets the insured status requirements of the Social Security Act through September 30, 2014.

Step one.  Plaintiff has not engaged in substantial gainful activity since July 13, 2009, his alleged onset date (Tr. at 13).

---

[34]Specific Vocational Preparation  is defined in the Dictionary of Occupational Titles as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  An SVP of 2 means anything beyond short demonstration up to and including one month.

Step two.  Plaintiff suffers from the following severe impairments:  chronic obstructive pulmonary disease with history of partial right lung removal, hypertension, right upper quadrant abdominal hernia and headaches (Tr. at 13).  Plaintiff's mental impairment is not severe (Tr. at 14-15).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 15).

Step four.  Plaintiff's allegations of disabling symptoms are not entirely credible (Tr. at 16-19).  He retains the residual functional capacity to perform light work in that he can lift and carry 20 pounds occasionally and 15 pounds frequently; stand or walk with normal breaks for four hours per day; sit with normal breaks for six hours per day; push and pull without limitation; occasionally climb and balance; must avoid all exposure to wetness, humidity, dust, fumes, and hazards; must avoid moderate exposure to weather, vibration and heights; and must avoid concentrated exposure to temperature extremes (Tr. at 15-16).  With this residual functional capacity, plaintiff cannot return to his past relevant work (Tr. at 19).

Step five.  Plaintiff is capable of working as a bonder semi-conductor, a sedentary job with 2,000 positions in Missouri and 115,000 in the country; a touch-up screener, a sedentary job with 1,800 positions in Missouri and 98,000 in the country; or a document preparer, a sedentary job with 595 positions in Missouri and 25,600 in the country (Tr. at 20-21).

## VI.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible. He specifically challenges the ALJ's reliance on plaintiff's daily activities.

## A.    CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a

25

whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

[T]he claimant's statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the [determined] residual functional capacity assessment.

The claimant has chronic obstructive pulmonary disease (COPD) with a history of partial right lung removal in June 2007. Treatment for occasional colds and respiratory distress were treated through the emergency room department, as the claimant had no primary care physician and was not taking any routine medications.

Rex Gallemore, M.D. saw the claimant on March 2, 2010, to establish care with a physician. He reported that he had a history of having COPD, chronic bronchitis and emphysema, but was currently taking no medications. The claimant admitted that he continued to smoke approximately one pack of cigarettes on a daily basis. Blood pressure and heart rate were normal. The claimant was alert, oriented to person, place and time. [He was] ambulatory with a normal gait. There was a presence of diminished breath sounds bilaterally consistent with the claimant's history. Otherwise, the lungs were without crackles or wheezes. Abdomen was soft and nontender to palpation. No masses or rebound tenderness [were] noted. There was a presence of a large surgical scar overlying the right posterior thoracic area, but cervical spine, thoracic spine and lumbar spine were without scoliosis[35] or kyphosis.[36] Extremities were without cyanosis or edema. Dr. Gallemore recommended the claimant undergo cardiac stress testing and echocardiography in order to evaluate his complaints of having chest pain, shortness of breath and dyspnea on exertion.

Yung H. Hwang, M.D., examined the claimant on March 23, 2010. The claimant reported that he was taking Combivent for his symptoms; however, he continued to smoke one (1) pack of cigarettes a day. On examination, lung sounds were diminished bilaterally with frequent wheezing and rhonchi audible. Accessory muscles were used to breathe deeply. His heart had a normal sinus rhythm and no murmur. Abdomen was soft, not distended. Groin showed no hernia. Neurological examination was

---

[35]

[36]



normal. Dr. Hwang concluded the claimant was quite limited due to respiratory distress with shortness of breath, wheezing and coughing attacks. The claimant needed to see his regular physician for proper medication and treatment as the medication Combivent, alone, was not controlling the wheezing and discomfort from shortness of breath or coughing. Dr. Hwang recommended the claimant have further pulmonary function testing and have a Nebulizer for home treatment, as well as getting Oxygen at night to relieve symptoms and stated that in the meantime, the claimant was unable to work in any type of employment.

In April 2010, the claimant tolerated pulmonary function testing well with very good effort. He achieved an FEV1 score 2.75, post bronchodilator, which is 70% of predicted.

Although the claimant has received some form of treatment for his allegedly disabling symptoms, which would normally weigh somewhat in the claimant's favor, the record also reveals that the treatment has been generally successful in controlling the claimant's symptoms. The record shows the claimant has been receiving treatment from Bruce Akuna, M.D. of the Freeman Family Clinic, since April 29, 2010. Initially, he presented with complaints of difficulty breathing, shortness of breath, pain with breathing and being lightheaded, several times per days. The claimant reportedly had been on Combivent in the past, but was not on any current medications. Medications were prescribed. In May 2010, an increase in the claimant's blood pressure was notice[d]. Medication for blood pressure was started. By July 15, 2010, the claimant was noted to be doing well. Blood pressure was well controlled. Breathing was doing well on medications. The claimant reported some right upper quadrant pain, consistent with a hernia. Physical, heart and lung examinations were within normal limits.

Dr. Bruce Akuna completed a medical source statement on May 7, 2010, for the claimant. Dr. Bruce [sic] opined that the claimant has the ability to lift and/or carry 15 pounds frequently and 20 pounds occasionally, stand and/or walk 4 hours throughout an 8-hour workday, sit 6 hours throughout an 8-hour workday, unlimited push and/or pull, occasionally climb and balance, avoid any exposure to wetness/humidity, dust/fumes and hazards, avoid moderate exposure to weather, vibration and heights and avoid concentrated exposure to extreme cold and extreme heat and the claimant would need to lie down or recline to alleviate symptoms, during an 8-hour workday. Dr. Akuna noted the claimant would have some decrease in concentration, persistence or pace, due to medications. Later, Dr. Akuna submitted an addendum to this medical source statement, clarifying that the claimant would need to take 2 1/2 breaks for 30 minutes, in an 8-hour workday.

In October 2010, the claimant was seen in the emergency room for abdominal pain. Physical examination showed some tenderness to the abdominal area. Clinical impression was atrial ventricular hernia. The claimant was discharged home, with recommendations to follow-up with his physician. Respiratory examination was normal.

* * * * *

The claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. In a Function Report - Adult form, the claimant has reported the following daily activities: 1) performs personal care, 2) prepares meals, 3) cares for small pets, 4) household cleaning, 5) laundry, 6) garbage burning, 7) yard work, 8)9) [sic] shops for groceries, 10) handles household finances and 11) transports his son, daughter and daughter-in-law to and from their individual employment positions.

The claimant testified that he experiences daily problems with shortness of breath that affects [sic] his ability to walk and stand. He reported that he could only walk 50 feet and stand 30 minutes. However, treatment notes show the claimant's breathing does well with medications. Physical, heart and lung examinations are within normal limits. The actual test results from the pulmonary function study only shows [sic] moderate level of COPD which is inconsistent with claimant's subjective complaints of severe breathing problems. The claimant testified that he continues to smoke despite his allegations of severe breathing problems which also suggest[s] his breathing may not be as disabling as stated by the claimant.

As to the claimant's complaints of severe headaches, he testified that he needs to lie down two (2) times a day, due to headaches. However, treatment records note very little mention of treatment for headaches. Dr. Akuna noted the claimant's symptoms were as a result of COPD and decreased stamina, when noting the need to lie down. The claimant told Dr. Amy Cole that his need to lie down is due to hernia pain and the need to relieve hernia pain. He also told Dr. Cole that he spent a lot of his time driving other family members to and from work, as they only had one (1) car. The claimant also reportedly does house cleaning, keeps up with the bills and watches television, during the day, which is inconsistent with his testimony at the hearing. MMPI-2 testing according to Dr. Cole also showed consistent exaggeration which also negatively impacts claimant's credibility.

The claimant also testified that he needs to lie down, due to severe pain from an abdominal hernia. Dr. Akuna noted on July 15, 2010, the claimant's hernia was reducible. The course of treatment pursued by Dr. Akuna with regards to the claimant's abdominal hernia is not consistent with what one would expect if the claimant were truly disabled, as Dr. Akuna's records do not show any recommendations for the claimant to see a specialist or for any further treatment. Thereby, the undersigned finds the claimant's abdominal hernia does not cause any additional limitations than those included in the above functional capacity assessment.

The claimant testified that depression causes problems with concentration and focus. However, he continues to drive other family members to and from different locations of employment on a daily basis, read, watch television and handle his own finances. The performance of these activities is inconsistent with a conclusion that the claimant does not have sufficient concentration, persistence or pace to perform the basic mental activities of work.

(Tr. at 17-19).

1.    *PRIOR WORK RECORD*

According to plaintiff's report to Dr. Cole, plaintiff left each of his jobs for reasons other than his impairment. He said he left his longest factory job because the fiberglass was effecting his lungs. However, when he was at the hospital in June 2007 for his lung surgery, he described his employment to his treating doctor as follows: "[He] works at a factory that makes military hoods for vehicles. In his job he is not directly exposed to toxins or dust but he does run machines that use fiberglass and resins but all of those are enclosed in hooded equipment and he has very little exposure to the fumes. He has no other significant exposures to organic dusts, welding, etcetera." Plaintiff was released to return to work on July 16, 2007. His earnings record shows that plaintiff earned $26,944.42 from Able Manufacturing in 2006; he earned $29,975.03 from Able Manufacturing in 2007 (Tr. at 132). Therefore, plaintiff clearly returned to his factory job for the remainder of 2007 after undergoing lung surgery. Plaintiff testified that after several temporary jobs ended, he applied for and received the maximum amount of unemployment benefits which ended sometime in 2009. His wife is also attempting to obtain disability benefits, and the three other adults living in plaintiff's household have jobs but are only able to get to and from work because plaintiff is available all day to drive them to and from their destinations in the family's only car. While plaintiff and his family may be victims of the economic downturn the country has experienced in recent years and may be struggling to find and keep jobs due to limited transportation, this factor actually supports the ALJ's finding that plaintiff's allegations of disabling symptoms is not entirely credible. Plaintiff's availability to drive family members to and from work would obviously be compromised should he find full-time employment -- a factor which suggests plaintiff may be motivated to obtain disability benefits for a reason other than a true inability to work.

## 2. DAILY ACTIVITIES

Plaintiff told Dr. Cole that he does not go to bed until 2:30 a.m. after he has made the last trip transporting a family member to or from work. This daily activity alone strongly suggests that any need to lie down during the day is caused by plaintiff's inability to sleep a full night due to his chauffeuring duties.

The ALJ noted that plaintiff does housework such as dusting, washing dishes, preparing meals, cleaning, doing laundry, burning garbage, caring for pets, and mowing the lawn. He drives, manages his finances, reads books, watches television, shops, and can care for himself. He talks on the phone, visits with family, and attends church services regularly. The ALJ did not err in relying on these daily activities in assessing plaintiff's credibility. Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009) (acts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking are inconsistent with subjective complaints of disabling symptoms).

## 3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

The record reflects that plaintiff did not seek medical treatment for 17 1/2 months, with his alleged onset date right in the middle of that time. Although he claims that headaches contribute to his disability, as late as March 23, 2010, plaintiff denied headaches when he saw Dr. Hwang. In a Function Report dated March 8, 2010, plaintiff reported that he reads often, which is inconsistent with the headaches he described in his hearing testimony.

The ALJ properly noted that plaintiff continues to smoke, which suggests that his symptoms are not as bad as he alleges. On August 10, 2007 -- about two months after plaintiff's surgery and during a time when he had not smoked since he had his surgery, according to the medical records -- plaintiff had normal breath sounds and a normal exam, suggesting that if he quit smoking again, his symptoms would not be as bad as he claims.

31

Once plaintiff resumed smoking, abnormal breath sounds and complaints of shortness of breath resumed as well, again suggesting that plaintiff's symptoms are not as disabling as he claims or he would be more motivated to stop smoking.

4. *PRECIPITATING AND AGGRAVATING FACTORS*

The record shows that plaintiff's failure to use his inhalers as often as he should contributed to wheezing and diminished breath sounds in October 2007. In October 2008 he had a normal airway, but it was irritated from cigarette smoking. Clearly smoking is the strongest aggravating factor in the record.

In April 2010 plaintiff indicated that Combivent helped his symptoms but he was not taking it because he had no insurance. Yet he continued to spend money on cigarettes.

Plaintiff testified that his headaches are caused by high blood pressure, but the medical records indicate that plaintiff's blood pressure was adequately controlled with medication.

5. *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION*

The medical records establish that plaintiff's symptoms were adequately controlled when he took his prescribed medication as directed.

6. *FUNCTIONAL RESTRICTIONS*

In June 2007 right after his lung surgery and several years before his alleged onset date, plaintiff was limited to no heavy lifting for eight to ten days. The following month he was advised by his doctor to increase his activity level.

On March 8, 2010, plaintiff stated in a Function Report that his condition does not affect his ability to sit or stand. Yet he testified at his administrative hearing that he could only sit for 10 to 30 minutes at a time. Dr. Akuna is the only doctor who found that plaintiff had a limited ability to sit or stand -- he found that plaintiff could sit for one hour at a time and for six hours total and he could stand for less than 15 minutes at a time and for four hours total

32

per day.  However, these findings were recorded one week after plaintiff saw Dr. Akuna for the first time, and on that first visit plaintiff's physical and psychological exams were normal. Additionally, these findings were made on May 7, 2010 -- only two months after plaintiff reported that he had no difficulty sitting or standing.

## B.      CREDIBILITY CONCLUSION

The ALJ properly noted that when plaintiff saw Dr. Cole in connection with his disability application, he exaggerated his symptoms to the point of making the results invalid. This obviously reflects negatively on his credibility.  Plaintiff reported on March 8, 2010, that his impairments do not affect his ability to stand, sit, remember, complete tasks, understand, or follow instructions.  This is inconsistent with his subsequent allegations that he suffers from a disabling mental impairment and that he is limited in his ability to sit or stand.  Plaintiff was advised prior to his lung surgery to stop smoking.  He saw improved respiratory testing after he had refrained from smoking while in the hospital and for a brief time afterward.  Once he resumed smoking, his doctors heard increased abnormal breath sounds albeit mild.  Plaintiff continued to smoke heavily despite (1) having a severe lung impairment, and (2) allegedly having insufficient funds to attempt treatment recommendations.

Plaintiff was discharged in June 2007 after his surgery with no pain and no trouble breathing.  The doctor described his surgery as having "excellent results."  Plaintiff had essentially normal exams throughout this record.  He went long periods of time without seeking medical treatment for his allegedly disabling impairments (but did not forego medical care altogether as he was seen for a rash during this time).  Plaintiff went 17 1/2 months with no medical care, applied for disability benefits and then two weeks later went to see a doctor to establish care, was on no regular medications at that time, had a normal physical exam at that time, and never returned to see that doctor again.  The tests the doctor recommended were

33

never done. A bit later plaintiff went to yet another doctor who recommended further testing. And just a couple weeks after hat, he saw a third doctor for the first time and had *that* doctor complete disability paperwork even though the doctor did not have pulse oximetry test results available, the pulmonary function tests that had been recommended by the other two doctors had not been done, and he explicitly based his findings on plaintiff's allegations.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's allegations of disabling symptoms are not credible.

## VII. DEPRESSION

Plaintiff argues that the ALJ erred in finding plaintiff's depression a nonsevere impairment.

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-severe impairment.

(a) Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

(b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include--

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

34

     (5)     Responding appropriately to supervision, co-workers and usual work situations; and

     (6)     Dealing with changes in a routine work setting.

Plaintiff bears the burden of establishing that an alleged impairment is severe. <u>Caviness v. Massanari</u>, 250 F.3d 603, 604-605 (8th Cir. 2001). While severity is not an onerous requirement, it is not a "toothless standard," and claimants must show more than minimal interference with basic work activities. <u>Kirby v. Astrue</u>, 500 F.3d 705, 708 (8th Cir. 2007). To be considered severe, the impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. . . and must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." <u>Martise v. Astrue</u>, 641 F.3d 909, 923 (8th Cir. 2011) (quoting 20 C.F.R. § 404.1508).

The ALJ had this to say about plaintiff's mental impairment:

The claimant's medically determinable mental impairment of major depression - mild does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere.

The claimant has not experienced any psychological or psychiatric treatment other than receiving a prescription for Celexa, prescribed by a general practitioner.

The claimant was referred to AmyKay Cole, Ph.D., on January 12, 2011. Mood was mildly depressed with congruent affect and feelings of sadness. Cognitive functioning appeared intact throughout the appointment. Testing revealed a Full scale IQ of 82 that technically falls within the borderline intellectual functioning; however, he demonstrated a significant relative strength with his verbal abilities and Dr. Cole felt it was possible that the claimant's depression affected his processing speed, which lowered his overall IQ score. For those reasons, the claimant was not diagnosed with Borderline Intellectual Functioning. Visual memory was found to fall within the average range as did his immediate and delayed memory scales. Personality functioning was addressed with an MPI-2, but the claimant was noted to have exaggerated his psychological symptoms to the point where that particular measure was not able to be interpreted. Dr. Cole indicated the claimant was likely experiencing an adjustment disorder when first addressing his diagnosis and limited finances; however, over the last year his feelings of depression had intensified at least partially due to the suicide of his oldest brother. Diagnosis was major depressive disorder, single episode, mild.

35

Dr. Cole is not a treating medical source and her opinion is not entitled to controlling weight. However, Dr. Cole's opinion is well supported by objective diagnostic testing, her trained observations, an impartial analysis of the evidence of record, and a well-reasoned conclusion. She documented and attempted to resolve contradictions with input from the claimant and analyzed the claimant's statements in view of the claimant's daily activities, history, and previous work experience. Therefore, Dr. Cole's opinion has been given substantial weight.

In making this finding, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments. These four broad functional areas are known as the "paragraph B" criteria.

The first functional area is activities of daily living. In this area, the claimant has mild limitation. Although the claimant attributes his limitations of daily activity limitations to his physical impairments and not a psychiatric condition, his appearance is described as adequate, with somewhat long hair and a missing front tooth. Thus, the claimant has mild limitations in activities of daily living.

The next functional area is social functioning. In this area, the claimant has mild limitation. The claimant reported that he has no problems with getting along with others; however, the evidence shows that the claimant's life mostly exists around his immediate family members, as he denies any social visits in or out of the home, with anyone else. Thus, the claimant has a mild limitation in social functioning.

The third functional area is concentration, persistence or pace. In this area, the claimant has mild limitation. Although the claimant indicated some issue with concentration, he reported that he needs no reminders taking medication, he could prepare 20-30 minute meals, 2-3 times a week, grocery shop in stores 2 days a week, handle his financial matters, read books and watch television daily. He also reported that he can follow written and spoken instructions and mentioned no difficulties in completing tasks. Further, the claimant told Dr. Amy Cole that he spent most of his day driving family members to and from their places of employment and keeping up with his finances. Thus, this is consistent with an individual with mild limitations, at the most, in the area of concentration, persistence or pace.

The fourth functional area is episodes of decompensation. In this area, the claimant has experience no episodes of decompensation which have been of extended duration.

Because the claimant's medically determinable mental impairment causes no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, it is nonsevere.

(Tr. at 14-15).

36

Plaintiff specifically argues that Dr. Cole detailed how plaintiff's depression "is likely limiting his processing speed and reasoning," Dr. Akuna prescribed Celexa to treat depression, and plaintiff testified that he has trouble concentrating because of his depression.

In support of his decision, the ALJ noted that plaintiff only received conservative treatment in the form of medication from a general practitioner, with no referrals to a mental health specialist, suggesting that plaintiff's mental health concerns are not as severe as described in his testimony at the administrative hearing. In the absence of a treating mental health specialist, the ALJ reasonably relied upon the observations and opinions of Dr. Cole, a non-treating psychologist who examined plaintiff in January 2010. Following a thorough interview and a battery of tests, Dr. Cole concluded that plaintiff's depression was mild. She noted that plaintiff exaggerated his psychological symptoms on a personality assessment to the point that she could not interpret the results of the entire assessment. Dr. Cole concluded that plaintiff could adapt to a simple workplace environment without intrusion from psychological symptoms. This is consistent with plaintiff's admission in his Function Report that his impairment does not limit his ability to remember, complete tasks, understand, or follow instructions.

In addition, the ALJ noted, after reviewing plaintiff's daily activities and Dr. Cole's observation of his punctuality and adequate grooming, that plaintiff had only a mild limitation in his activities of daily living. Dr. Cole noted that plaintiff was able to spend a substantial part of his day driving his three relatives to and from work and had sufficient concentration to remain friendly and responsive throughout a "long afternoon of testing."

Plaintiff reported that he could complete his own personal hygiene, manage his finances, read books, watch television daily, prepare simple meals, and shop for groceries. At a physical evaluation in March 2010, Dr. Hwang noted that plaintiff was "mentally clear" and

able to tend to his own daily needs and affairs. Dr. Hwang also found plaintiff "very intelligent," and his psychological evaluations of plaintiff were normal. Therefore, the ALJ found that plaintiff had no more than a mild limitation in daily activities.

Concerning social functioning, the ALJ noted that plaintiff reported having no problems getting along with others. Plaintiff stated that he got along "fine" with authority figures. In her psychological evaluation report, Dr. Cole indicated that plaintiff was "friendly and good natured throughout" his lengthy appointment. Dr. Cole found that plaintiff had the capacity to work appropriately with the general public, coworkers, and supervisors. Accordingly, substantial evidence supports the ALJ's finding of no more than a mild limitation in social functioning.

Likewise, substantial evidence supports the ALJ's finding of only mild limitations in concentration, persistence, or pace. The ALJ noted that plaintiff needed no reminders to take his medication, could prepare meals multiple times a week, could grocery shop more than once weekly, could handle his finances, and could read books and watch television. The ALJ also considered that plaintiff reported no difficulties following written and spoken instructions or completing tasks. Furthermore, plaintiff told Dr. Cole that he spent much of his day driving family members to and from their places of employment, which indicated a higher degree of concentration, persistence, or pace than one would expect given plaintiff's complaints of severe mental impairments. In her evaluation report, Dr. Cole noted that plaintiff had a mild limitation in his concentration and speculated that it could be due to his alleged depression, but found that plaintiff would be able to concentrate and persist with simple tasks. Dr. Cole concluded that plaintiff would be able to adapt to a simple workplace environment without difficulty. Accordingly, substantial evidence in the record supported the ALJ's finding as to plaintiff's limitation in concentration, persistence, or pace.

38

As for the fourth functional area, the ALJ noted that plaintiff had experienced no episodes of decompensation which have been of extended duration. Plaintiff has not shown, or alleged, any episodes of decompensation. As demonstrated above, the evidence concerning plaintiff's mental impairments supports, at most, a finding of "mild" limitations of the first three functional areas and no episodes of decompensation of an extended duration. Accordingly, the ALJ properly found that plaintiff's mental impairments were not severe. See 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).

Plaintiff also argues that the ALJ failed to account for his mental impairments in the residual functional capacity finding. However, plaintiff has failed to point to any specific mental limitations that would have affected the ALJ's residual functional capacity determination or the ultimate determination that plaintiff was not disabled. As plaintiff states in his brief, under SSR 96-8p, an ALJ must consider non-severe impairments in assessing a claimant's residual functional capacity. However, the ALJ stated that he had considered plaintiff's severe and non-severe impairments pursuant to SSR 96-8p. Moreover, the ALJ clearly discussed the alleged limitations from plaintiff's depression in formulating plaintiff's residual functional capacity. Specifically, the ALJ considered plaintiff's testimony that his depression caused problems with concentration and focus. However, the ALJ noted that plaintiff continued to drive family members to and from their various jobs on a daily basis; and he observed that plaintiff reads, watches television, and manages his finances. The ALJ found that these activities were inconsistent with a conclusion that plaintiff did not have sufficient concentration, persistence, or pace to perform the basic mental activities of work.

Plaintiff suggests in his brief that the ALJ's residual functional capacity finding should have included a limitation in social functioning. However, as discussed above, plaintiff did not allege any limitations in this area. Additionally, Dr. Cole found that plaintiff would have no

39

problem interacting appropriately with supervisors, co-workers, or the public, and he would be able to respond to changes in the routine work setting. Thus, the ALJ did not err in omitting any limitations related to social functioning.

Finally, plaintiff suggests that the ALJ's residual functional capacity assessment did not account for plaintiff's ability or inability to handle complex situations. While Dr. Cole indicated that plaintiff had moderate limitations in his ability to understand, remember, and carry out complex instructions and moderate limitations in his ability to make judgments on complex work-related decisions, plaintiff has not shown any error from the omission of this limitation from the residual functional capacity assessment. A disability claimant challenging an administrative finding bears the burden of establishing that the error prejudiced him. Van Vickle v. Astrue, 539 F.3d 825, 830 (8th Cir. 2008) ("There is no indication that the ALJ would have decided differently [had he avoided the alleged error], and any error by the ALJ was therefore harmless."). Although the ALJ did not address these limitations in his residual functional capacity assessment, any such limitations would not affect the ALJ's ultimate conclusion that plaintiff could perform other work available in the national economy. The jobs cited by the vocational expert, and relied on by the ALJ, were all unskilled work with an SVP of two, which would not involve complex situations. See 20 C.F.R. §§ 404.1568(a) and 416.968(a) (unskilled work requires little or no judgment to do "simple" duties that can be learned on the job in a short period); SSR 00-4p ("unskilled" work corresponds to an SVP level of 1 or 2). As discussed above, Dr. Cole found no limitation with respect to plaintiff's ability to understand, remember, and carry out simple instructions or to make judgments on simple work-related decisions, and neither did any other doctor in this record.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's mental impairment is not severe, and the ALJ properly

considered plaintiff's mental impairment in assessing plaintiff's residual functional capacity.

## VIII.   *PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY*

Plaintiff argues that the ALJ erred in failing to assess any limitations due to plaintiff's headaches and his treating physician's recommendation that plaintiff lie down 1 1/2 times a day for 30 minutes due to medical conditions. This argument is without merit.

According to SSR 96-8p, when formulating a residual functional capacity, the ALJ must (1) include a narrative discussion of how the evidence supports each conclusion and cite specific medical facts and non-medical evidence; (2) assess the individual's ability to perform sustained work activities in a work setting on a regular and continuing basis; and (3) describe the maximum amount of each activity the person can perform. The ALJ has the primary responsibility for assessing the residual functional capacity, but the claimant retains the burden of proving the residual functional capacity. Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Roberts v Apfel, 222 F.3d 466 (8th Cir. 2000). The ALJ must base the residual functional capacity on all of the relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own credible descriptions of his limitations. Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001).

Plaintiff argues that even though the ALJ found that Dr. Akuna's opinion is entitled to controlling weight, the residual functional capacity assessment does not address Dr. Akuna's finding that plaintiff's sitting and standing are limited or his finding that plaintiff needs to lie down two and a half times a day.

The ALJ stated as follows with regard to Dr. Akuna:

As for the opinion evidence, Social Security Ruling 96-2p states that if a treating source's medical opinion is well-supported and consistent with the other substantial evidence in the case record, it <u>must</u> be given controlling weight; i.e., it must be adopted. The opinion of Dr. Bruce Akuna is well supported by extensive medical documentation as well as his trained observations and is, therefore, entitled to controlling weight,

41

except the undersigned notes the limitation of the claimant's need to lie down is given only limited weight for the reasons previously cited in this determination and because there is nothing in the record to contradict that the claimant's need to take a break can be accommodated by normal breaks.

(Tr. at 19).

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

Although the ALJ indicated that Dr. Akuna's opinion was entitled to controlling weight, I question whether the record even supports such a finding at least in respect to the Medical Source Statement. In any event, the relevant portion of the opinion is the need to lie down multiple times during the day, an opinion which the ALJ gave "limited" weight. Reviewing the factors set out in § 404.1527(d), I note that:

1.      The length of the treatment relationship at the time Dr. Akuna completed the Medical Source Statement was four days.

2.      The frequency of exams was almost nil -- plaintiff saw Dr. Akuna one time four days before Dr. Akuna completed plaintiff's disability paperwork.

42

3.     The nature and extent of the treatment relationship was that plaintiff was looking for a doctor to fill out disability paperwork.  He applied for benefits in February 2010 after not having seen a doctor in a very long time.  In that paperwork he reported that he can walk about 50 feet before needing to stop and rest.  Plaintiff went to Dr. Gallemore two weeks later to establish care.  He told Dr. Gallemore that he was "totally disabled" due to his history of COPD and chronic bronchitis.  During this visit "to establish care" not only did plaintiff report that he is totally disabled, he specifically set out his functional abilities -- he could walk 50 to 75 feet before needing to stop and rest.  Plaintiff was taking no medications.  All of Dr. Gallemore's findings were "by history" as plaintiff's physical exam was normal, i.e., he assessed shortness of breath by history, chronic obstructive pulmonary disease by history, chronic bronchitis by history, etc.  Dr. Gallemore recommended plaintiff undergo testing -- instead of doing that, plaintiff searched for a different doctor.

Less than a month later, plaintiff saw Dr. Hwang for the first time, and Dr. Hwang completed a letter in support of plaintiff's disability application.  Dr. Hwang examined plaintiff and found no headaches, no mental problems, a normal physical exam (including the abdomen which plaintiff claims had a disabling hernia) except for diminished breath sounds.  His recommendations explicitly limit the findings to reporting what plaintiff said as opposed to what Dr. Hwang found plaintiff is capable of, i.e., "Patient stated" he is able to walk 10 minutes at most before he is out of breath and has to rest but is able to lift 50 pounds although he is unable to carry.  Dr. Hwang then stated that plaintiff needs to have pulmonary function testing and additional medications for his breathing and concluded that "in the meantime" plaintiff is unable to work in any type of employment.

About a month after that, plaintiff went to see Dr. Akuna for the first time.  Plaintiff told the doctor on this first visit that he gets lightheaded, it happens every day several times per

43

day, it starts two hours after he gets up and stays the remainder of the day. Dr. Akuna specifically noted under "review of symptoms" that plaintiff had no respiratory symptoms and no psychological symptoms. What physical exam he performed was within normal limits. This included "general," heart and cardiovascular, psychological, and skin. There was no examination of plaintiff's lungs as that section of the form was left blank. Dr. Akuna recommended lab work, but plaintiff said he would like to wait until he has insurance, without indicating exactly how he expected to obtain insurance any time in the near future. Based on nothing but that, Dr. Akuna completed four days later a Medical Source Statement finding that plaintiff could walk continuously for less than 15 minutes. I find this highly coincidental, seeing as how there is nothing at all in his medical records dealing with plaintiff's ability to walk; however, this finding is nearly identical to what plaintiff wrote in his Function Report, told Dr. Gallemore a few weeks earlier when he attempted to establish care with that doctor but for some reason changed his mind, and told Dr. Hwang a few weeks earlier in connection with his disability paperwork.

It does not appear to me  -- at least when the Medical Source Statement was completed -- that the nature and extent of the treatment relationship was that of a true "treating physician."

4.      The supportability by medical signs and laboratory findings is also almost non-existent when it comes to the opinion in the Medical Source Statement. As discussed above, Dr. Akuna's only physical exam of plaintiff at the time this form was completed was essentially normal. There is no basis in his medical records for the limitations of lying down during the day. The Medical Source Statement says, "If patient suffers pain, is there a need to lie down or recline to alleviate symptoms during an 8 hour work day?" (Tr. at 373). Dr. Akuna did not even specify what was causing the "pain" that required plaintiff to lie down during the day to

44

alleviate that pain.

The form asks for the clinical findings, and Dr. Akuna wrote elevated blood pressure and shortness of breath. Plaintiff's blood pressure was 156/98; however, a month earlier Dr. Gallemore noted that plaintiff was on no medication. And the records show that two months after the Medical Source Statement was completed, plaintiff's blood pressure was normal since he had started medication. As discussed above there is no evidence that Dr. Akuna performed any examination of plaintiff's lungs and specifically noted that plaintiff had no respiratory symptoms.

Under laboratory findings, Dr. Akuna wrote PFT. However, there is no record of him reviewing any pulmonary function test. In fact when plaintiff saw Dr. Gallemore on March 2, 2010, that doctor recommended that plaintiff have a pulmonary function test; and when plaintiff saw Dr. Hwang on March 23, 2010, he also recommended that plaintiff get a pulmonary function test, but there is no record of any pulmonary function test having been done.

5.      The consistency of Dr. Akuna's opinion with the record as a whole is also questionable -- no other treating doctor found that plaintiff was limited in his ability to stand and sit or that he needed to lie down. Plaintiff never told any other treating source that he lay down several times during that day or that he had difficulty with standing or sitting. In fact plaintiff specifically stated in his disability paperwork prior to searching out a doctor to complete this paperwork that his impairment did not affect his ability to sit or stand. In that same paperwork, he described his day without mentioning this need to lie down at all during the day much less 2 1/2 times a day for 30 minutes at a time. The record establishes that Dr. Akuna indicated in this form that some unidentified pain was the basis for plaintiff's need to lie down. Plaintiff told Dr. Cole that it was hernia pain that caused him to have to lie down. He

45

testified at the administrative hearing that it was his headaches that caused him to have to lie down. And he later said that he had to lie down to due fatigue. The record establishes that there was no mention in any medical record of a need to lie down until plaintiff applied for disability benefits. After that the need to lie down was allegedly caused by a myriad of things. However, the record establishes that during this time plaintiff's physical exams were essentially normal, he was on no regular medication, his hypertension was adequately controlled when he took his medication as directed, he had not reported headaches to any doctor and in fact had denied headaches, and he did not follow through with the recommended treatment for his hernia. There simply is no plausible evidence of any need to lie down during the day, other than plaintiff's hectic schedule of chauffeuring his family members to and from work at all hours of the day and night, resulting in daytime fatigue.

6.      Dr. Akuna is a family practice doctor -- he is not a specialist in either pulmonary disorders or hernias.

Based on the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that Dr. Akuna's opinion with regard to plaintiff's need to lie down during the day is not entitled to controlling weight. I also find that Dr. Akuna's opinion in the Medical Source Statement that plaintiff is limited in his ability to stand and sit is not supported by the substantial evidence in the record as a whole.

## IX.   CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
November 30, 2012